F I L E D
United States Court of Appeals
Tenth Circuit

MAY 26 2000

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

WAYNE L. FORD,

        Plaintiff-Appellant,

v.

KENNETH S. APFEL, Commissioner
of Social Security Administration,

        Defendant-Appellee.

No. 99-5134
(D.C. No. 97-CV-621-EA)
(N.D. Okla.)

ORDER AND JUDGMENT *

Before **KELLY** , **McKAY** , and **HENRY** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

Claimant Wayne Ford appeals from the district court's order affirming the

decision of the Commissioner of Social Security. In that decision, the

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Commissioner denied claimant's application for disability insurance benefits under Title II of the Social Security Act. *See* 42 U.S.C. § 423. We exercise jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291, and reverse.

## I. Legal standards

Our review is limited to determining whether the Commissioner's decision is supported by substantial evidence on the whole record and comports with relevant legal standards. *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991). Claims for disability benefits are evaluated according to the five-step sequential process set forth in 20 C.F.R. § 404.1520. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988). At step four of the process, "the claimant must show that the impairment prevents [him] from performing work he has performed in the past." *Id.* at 751 (quotation omitted and alteration in original). If the claimant is successful at this stage, then the claimant

> has met his burden of proof, establishing a prima facie case of disability. The evaluation process thus proceeds to the fifth and final step: determining whether the claimant has the residual functional capacity (RFC) "to perform other work in the national economy in view of his age, education, and work experience."

*Id.* (citation and footnote omitted). At step five, the burden of proof is on the Commissioner "to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy."

*Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir. 1989) (quotation omitted). The Commissioner's decision "must be based on evidence offered at the hearing or otherwise included in the record." 20 C.F.R. § 404.953(a).

## II. Relevant facts

Claimant's problems began when he injured his back in two automobile accidents, with the first accident occurring in 1967. *See* Appellant's App. at 174, 328, 354. Despite lumbar and thoracic back pain, he managed to work as a concrete finisher until 1982 when he had the second car wreck, *see id.* at 130, 174; he then suffered a heart attack in 1983. *See id.* at 170. He resumed work sometime in 1984, but had nominal earnings in 1985 and 1987. *See id.* at 130. Claimant drank heavily between 1977 and 1992. In 1987, he was admitted to the hospital and diagnosed with alcoholic hepatitis, hepatic encephalopathy, alcoholic liver disease, and renal cell carcinoma. *See id.* at 239. Doctors removed the cancerous kidney. In 1987, claimant applied for but was denied social security disability benefits based on these conditions, back problems, and numbness in arms and legs. *See id.* at 93-94, 164. He did not appeal from this denial.

Claimant stated in 1988 that he had no medical insurance and could not pay his doctors. *See id.* at 91. In 1988 and 1989, claimant was unsuccessful at attempts at alcohol treatment. *See id.* at 301. He was admitted to the hospital in 1992 for acute alcohol poisoning. *See id.* at 285. During that examination his

doctor noted "positive perilumbar muscle spasm." *Id.* at 286. After this admission, claimant successfully completed a course of in-patient treatment for alcoholism and remained sober through the time of the administrative hearing in 1995. *See id.* at 45. He also successfully completed training as a major appliance repairman in 1993.

After abstaining from alcohol, claimant began having severe, chronic headaches and also began seeking treatment for his chronic back and neck pain. *See id.* at 308, 354. When Dr. Sokolosky, his long-term treating physician, could not determine the cause of claimant's chronic headaches, in August 1992 he admitted him to the hospital for a computed tomography (CT) scan of the head and neck. *See id.* at 311. The CT scan revealed "cortical atrophy with associated ventricular and cisternal enlargement." *Id.* at 312. Dr. Sokolosky then referred claimant to an ear, nose, and throat specialist, Dr. Dushay, who in September 1992 diagnosed cervical myositis, cervical adenitis, laryngitis, and septal deviation, and diagnosed his headaches as "muscle contraction cephalgia [sic]." *Id.* at 317-19. Dr. Sokolosky diagnosed claimant as having "myositis," and his medical records note that claimant was treated for chronic low, mid, and cervical back pain and headaches from April 1992 through May 1995. *See id.* at 360-368, 388.

-4-

In June 1993, the Oklahoma state department of rehabilitative services sent claimant to Dr. Hastings, a consulting neurologist. *See id.* at 354. Dr. Hastings examined claimant, noted that claimant had not had extensive studies, and also noted that the head CT scan was "unremarkable." *Id.* Claimant's neurological exam revealed normal gait, coordination and upper reflexes, but "somewhat diminished" reflexes at the knee and no reflexes at the ankle. *Id.* He "d[id] not see any signs of active cervical or lumbar radiculopathy, thoracic disc disease or significant peripheral neuropathy" but stated that claimant "may have some symptoms . . . relate[d] to previous alcoholic peripheral neuropathy" and suggested he be treated with muscle relaxers and anti-inflammatory drugs. *Id.* at 355. Without making assessments on claimant's ability to lift or move large appliances, he opined that claimant was capable of functioning as a major appliance repairman and had "no neurologic disability." *See id.*

X-rays taken in July 1993 showed minimal degenerative joint changes in claimant's right hip, and ones taken in November 1995 showed additional degenerative joint changes in the right shoulder and both feet, and diffuse lumbar spondylosis between the L3 and S1 vertebraes. *See id.* at 419, 422-25. Dr. Sokolosky treated claimant with osteopathic adjustments and a variety of anti-inflammatory drugs, narcotic pain relievers, and anti-depressants. *See id.* at 360-68, 378. In April 1994, after claimant had taken 150 Tylenol III tablets in

one month for pain, Dr. Sokolosky requested consultations from a neurologist and a specialist in pain management. *See id.* at 375.

Dr. Eichert, a neurological surgeon, found "clinical evidence of a chronic lumbar radiculopathy, most likely from stenosis" in August 1994. *Id.* at 379. CT scans of his back showed "bilateral facet hypertrophy with ligamentous hypertrophy" at the L3 to L5 levels, mild disc space narrowing at the L5-S1 levels, and "facet arthrosis of the L3, L4, and L5 levels," but with no stenosis. *Id.* at 380-82. Dr. Sorenson, of the Pain Institute of Tulsa, examined and treated claimant between May and November 1994. *See id.* at 384-86. He reviewed the CT scan and stated that "it is possible facet irritation L5, S1 level. Also has paravertebral muscle spasming to the cervical area. Most intense discomfort is in lower lumbar." *Id.* at 384. Dr. Sorenson explained that

> [w]ith his history of multiple injuries, the progressive pain symptomatology and on examination of the films . . . there are multiple components associated with his pain symptoms. There are areas of significant muscle spasming located throughout the posterior serratus, rhomboid muscles, the cervical musculature and also the paravertebral gluteal muscles. Trigger point areas were located in some of these muscles and there were apparent facet discomfort also located. I do feel the headaches are associated more with some of the degenerative joint disease, myofascial and arthritic problems in these areas.

*Id.* at 392. Dr. Sorenson prescribed medications and suggested the possibility of injections and block techniques. *See id.* In 1995, Dr. Sokolosky diagnosed

continuing headaches and arthritis, stated that he "suspect[ed] fibromyalgia," and continued prescribing various medications. *Id.* at 388.

Claimant's application for benefits was originally denied on April 12, 1994, after Dr. Luther Woodcock, a medical consultant for the state, determined (without examining claimant) that his condition was not disabling. *See id.* at 102-111. Dr. Woodcock reviewed only Dr. Sokolosky's treatment records dated February 26, 1991 to March 11, 1994 in reaching his conclusion that claimant maintained the capacity to occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or sit six hours in an eight-hour workday, and perform unlimited pushing and pulling. [2] *See id.* at 104, 111. Claimant challenged the denial and requested a hearing before an administrative law judge (ALJ).

At the hearing in October 1995, claimant testified that he still had chronic headaches and that he could not walk very far or sit for very long because of the osteoarthritic pain in his toes, feet, knees, hips, and back. *See id.* at 48-49. He had to alternate sitting with lying down during the day and could not sleep well at night because of his need to change positions often. *See id.* at 49-50, 61. He could not use his hands to hold and squeeze or pull because of joint pain. *See id.* at 57, 61. He testified that he could not take the medications that were

---

[2]     Medium work is defined as the ability to lift up to fifty pounds, with frequent lifting of up to twenty-five pounds. 20 C.F.R. § 404.1567(c).

most effective against inflammation and pain because they impacted negatively on his liver and remaining kidney, and his doctor had told him there was nothing else he could do for him. *See id.* at 62-63. He further testified that he did not have the money to take "heated pool" treatments recommended by his doctor. *Id.* at 64.

At step four of his disability analysis, the ALJ found that claimant was unable to return to his former employment, *see id.* at 28, a conclusion that is supported by substantial evidence. He found, however, that claimant's statements concerning his impairment and its impact on his ability to work were "not entirely credible in light of discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, the medical history and the findings made on examination." *Id.* at 30. After hearing testimony from a vocational expert, the ALJ concluded at step five that claimant was not disabled because he could perform a full range of light work, including light and sedentary hand packaging and sedentary telemarketing work. *See id.* at 31-33, 70-71.

### III. Discussion

Claimant argues that the ALJ did not properly evaluate and consider his combination of impairments because the ALJ misinterpreted the medical records and erroneously refused to give credence to his testimony regarding disabling

pain.  *See Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987) (listing factors that ALJ should consider when determining the credibility of subjective claims of pain).  We agree.  Specifically, the ALJ stated that claimant's doctor did not make a diagnosis of headaches.  Our review of the record belies this finding, as Dr. Sokolosky, Dr. Dushay, and Dr. Sorenson all diagnosed chronic cephalalgia and/or headaches as one of claimant's medical conditions.  *See id.* at 311, 318, 368, 392.  The ALJ recognized that claimant's CT scans showed osteoarthritis in the back, hips, knees, and feet, but then concluded that "[t]here is no evidence of any osteoarthritis on objective examination or on any finding."  *Id.* at 30.  The CT scan itself contradicts this conclusion.

The ALJ next focused on the fact that "[t]here is no objective medical evidence showing a limitation on the claimant's ability to walk, stand, or sit, so long as such physical activities are consistent with light work."  *See id.*  Although it is true that none of claimant's physicians expressly placed limitations on claimant's abilities to walk, stand, or sit, he was not working during 1992-95 and none of the treating physicians were evaluating him for social security disability purposes.  Thus, the absence of such limitations in the medical record means nothing.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993) (stating that the Commissioner can not meet the burden of proving that a claimant

can perform work at a particular RFC level by relying on the absence of contraindication in medical records).

The ALJ commented that one of claimant's treating physician's "offered him facet injections which were turned down," *see* Appellant's App. at 30, apparently as a factor supporting his credibility determination, *see Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985) (setting out requirements that must be met before claimant's failure to undertake treatment will preclude recovery of disability benefits). The medical record shows that Dr. Sorenson discussed the "*aspects* of injections and block techniques" in his first visit with claimant, which claimant preferred "not to try at this time," *see* Appellant's App. at 392 (emphasis added), but it appears that trying injections remained an option that was discussed at a later visit, *see id.* at 385. Dr. Sorenson tried several different types of medications during his treatment of claimant. *See id.* at 384-85. The ALJ did not ask claimant at the hearing why he did not try the injections. On appeal, claimant states that he could not afford the injections that cost $500 each, and that there was no evidence that using them would allow him to return to work. *See* Appellant's Br. at 21. The fact that claimant had not undergone injection treatments at the time of the hearing is not, standing alone, sufficient evidence of a lack of credibility.

Critically, claimant's complaints of disabling pain and limitations associated with that pain are related to and consistent with the medical conditions diagnosed and treated by his treating physicians. Thus, contrary to the ALJ's findings, there were no discrepancies between the claimant's statements and the medical record. The ALJ cited no other "evidence" or factors supporting his finding regarding credibility. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings," and "failure to make credibility findings regarding . . . critical testimony fatally undermines the [Commissioner's] argument that there is substantial evidence adequate to support his conclusion that claimant is not under a disability." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotations and citations omitted). Because the ALJ's credibility finding is not supported by substantial evidence, we cannot uphold it.

The ALJ cited to no specific evidence supporting his conclusion that claimant "retains the residual functional capacity to perform the exertional demands of light work" with no significant non-exertional limitations to limit that range of work. Appellant's App. at 31. The Commissioner argues that Dr. Hasting's 1993 consultative opinion that claimant could work as a major appliance repairman provides support for the ALJ's conclusion. It does not appear that the ALJ relied on that opinion, perhaps because repairing major

-11-

appliances is apparently not considered to be light work. We also note that Dr. Hasting's opinion was admittedly given without benefit of the CT scans and X-rays taken later in 1993-94 and without awareness of claimant's osteoarthritis. *See id.* at 354. Later neurological examinations also contradicted Dr. Hasting's neurological findings. *See id.* at 379.

Although the ALJ did not mention Dr. Woodcock's report and in fact rejected Dr. Woodcock's findings that claimant could perform medium work, the Commissioner also argues that this report provides substantial evidence to support the ALJ's findings and conclusions. We disagree. In the section in which Dr. Woodcock was to explain how and why the medical evidence supports his conclusions, he stated that claimant had a degenerative disease of his spine and that the treating physician reported pain and muscle spasm with decreased range of motion and no neurological deficits. *See id.* at 104. Certainly, these statements do not support his conclusions that claimant could perform medium work. He also concluded, without explaining, that "pain does not limit further." *Id.* We are at a loss to understand how the specific findings made by Dr. Woodcock could be based on Dr. Sokolosky's records that did not include any statements regarding the claimant's physical capabilities, *see id.* at 108, or on the very limited medical records that he reviewed, especially in light of claimant's allegations in his application that he had headaches all the time, his back stayed

-12-

sore, and it hurt to move because of pain in his arms and legs. *See id.* at 114. Dr. Woodcock's conclusions do not provide support for the ALJ's findings that claimant can do a full range of light or sedentary work. *See Gatson v. Bowen*, 838 F.2d 442, 448 (10th Cir. 1988) (noting the "suspect reliability" of the views of consulting physicians who fill out the RFC forms when the forms bear no explanation of the basis for the conclusions and are filled out without examining the claimant).

We conclude that the Commissioner has failed to establish that claimant maintained the RFC to perform a full range of light or sedentary work unlimited by pain. Usually, we would remand to the agency for a supplemental hearing at which testimony by a vocational expert may be presented on the impact of plaintiff's pain on his ability to work within the RFC. *See Thompson*, 987 F.2d at 1493. The vocational expert testified at the hearing, however, that if claimant could not sit or stand for any length of time, the light-level jobs would be impacted, *see* Appellant's App. at 73; that if he had constant pain in his joints, severe headaches, and sleep deprivation from pain, his cognitive skills in all jobs would be "problematic," *id.* at 74; and that if the osteoarthritis caused a lot of pain in his joints, it "would be problematic for a work setting," *id.* at 76. We also note that, at the time of the administrative hearing, claimant was 53½ years old, which is "approaching advanced age" under the regulations. *See* 20 C.F.R.

Pt. 404, Subpt. P, App. 2 § 201.00(g) (approaching advanced age is fifty to fifty-four years old). Claimant is now fifty-eight years old, which is considered to be "advanced age." Under the medical and vocational guidelines, even when an individual of advanced age can perform a full range of light or sedentary work but must perform unskilled labor because he has no transferable skills from his previous work, as in this case, *see* Appellant's App. at 70-71, he is considered to be disabled. *See* 20 C.F.R. Subpt. P, App. 2, Tables 1, 2. Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose. *See Harris v. Secretary of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir. 1987).

The judgment of the United States District Court for the Northern District of Oklahoma is REVERSED and the case is REMANDED to the district court with instructions to remand to the Commissioner for an immediate award of benefits.

Entered for the Court


Monroe G. McKay
Circuit Judge

-14-